No. 86-573

IN THE SUPREME COURT OF THE STATE OF MONTANA

1987

---

IN RE THE MATTER OF THE PATERNITY
OF C. G., a minor,

STEVE WEBER,

       Petitioner and Respondent,

   -vs-

PAUL VAN DE KOP,

       Intervenor and Appellant.

---

APPEAL FROM: District Court of the Ninth Judicial District,
In and for the County of Teton,
The Honorable R.D. McPhillips, Judge presiding.

COUNSEL OF RECORD:

    For Appellant:

        Matteucci & Falcon; Daniel L. Falcon, Great Falls,
        Montana

    For Respondent:

        Lynch & Best; Elizabeth A. Best, Great Falls, Montana

---

Submitted on Briefs: April 16, 1987

Decided: August 17, 1987

Filed: AUG 17 1987

*Ethel M. Harrison*

Clerk

Mr. Justice L. C. Gulbrandson delivered the Opinion of the Court.

Paul Van De Kop appeals a Teton County District Court order awarding the custody of C.G., an infant, to his natural father, Steve Weber. We restate appellant's issues as (1) whether the District Court applied the correct test in determining the question of custody; and (2) whether the court properly concluded that the best interest of the child would be served by awarding custody to the natural father. We affirm.

In June 1985, R.G. gave birth to a son, C.G. Tragically, R.G. died of cancer in July 1986. Both Steve Weber and Paul Van De Kop were involved with R.G. prior to the birth of C.G.

Steve Weber met R.G. sometime in 1983. They considered marriage but eventually, in October 1984, Steve broke off the relationship because of R.G.'s alleged relationships with two other men, one of whom was appellant Paul Van De Kop. Steve is approximately twenty-nine years old, single and has a residence in Fort Collins, Colorado. He works as a surveyor for Western Geophysical Company and is required to travel extensively in his job. In late 1984, Steve learned that R.G. was pregnant but he refused to marry her despite her apparent desire to do so.

In November 1984, appellant and R.G. became close companions. R.G. told Paul, and he believed, that he was the father of the child. In February 1985, R.G. advised Steve that she had cancer. They stayed in almost daily contact and Steve accompanied R.G. to the Mayo Clinic in Rochester, Minnesota for treatment. In the spring of 1985, they again lived together for a time but Steve eventually left, apparently to return to work.

2

After giving birth to C.G. in June 1985, R.G. had major surgery for cancer in August 1985. When the cancer reoccurred in November 1985, Paul quit his job and moved into R.G.'s home to care for her and the child. Paul is thirty-two years old, single, has worked in the oilfield and lives in the Cut Bank, Montana area.

When R.G. died in July 1986, Paul knew that the child's birth certificate listed no one as C.G.'s father. Shortly after R.G.'s death, Paul learned that in January 1986 Steve had filed a petition for determination of paternity with the Teton County District Court. In August 1986, Paul moved to intervene in the paternity suit. He has lived with and taken care of the child since R.G.'s death. Each of the two men apparently sincerely believed that he was the child's father.

In November 1986, the District Court held a hearing on the custody of the child. Paternity of the child was not at issue at the hearing, appellant Van De Kop having conceded that blood tests conclusively proved that he was not the father. The District Court later found that Steve Weber was the natural father and that finding has not been challenged on appeal. The court heard extensive evidence as to the character and parenting skills of each man. Andree Deligdisch, a clinical social worker, testified that Paul had an excellent relationship with the infant. Monte Kuka, a clinical psychologist, performed a psychological evaluation of Paul. Kuka testified that Paul was very good at taking care of C.G. and that Paul's and C.G.'s relationship was very close and meaningful.

Patty Jacobs, a social worker for Teton County, prepared a Home and Family Assessment of Steve Weber pursuant to court order. Jacobs met with Weber several times and she testified that she saw no reason why he would not be a fit and able parent. Jacobs also testified that she had examined

3

a psychological evaluation of Weber which revealed no mental problems that would interfere with his ability to be a parent.

Steve Weber's brother, Jim, with whom Steve lives, testified that Steve takes his parental obligations very seriously and that Steve is an upstanding, decent person. Steve's father testified in a like vein.

Steve Weber testified at length and stated, among other things, that he attempted to voluntarily pay child support to R.G. but that she returned most of it. Steve also stated that, if he receives custody, he intends to take six months to a year off his job and devote that time to C.G. and he intends to secure employment permitting him to stay at home more than his current job allows.

The District Court heard other evidence criticizing, or tending to denigrate, Steve Weber's character and parenting abilities. The court apparently rejected such evidence because, in December 1986, it awarded custody of the child to Steve Weber. Paul Van De Kop appeals.

The first issue is whether the court applied the correct test in determining the issue of custody. Appellant correctly points out that the court relied in part upon an inappropriate case, Matter of Guardianship of Doney (1977), 174 Mont. 282, 570 P.2d 575, in reaching its decision. The Doney case arose from a custody battle between the natural father and the natural mother's sister. The natural father had granted temporary custody of the children to the sister after the natural mother's death. This Court addressed the Montana statutes then in effect and stated:

> A judicial hearing and finding of dependency and neglect under Title 10, Chapter 13, R.C.M. 1947, or judicial finding of willful abandonment or willful nonsupport under section 61-205, R.C.M.

4

> 1947, are the <u>exclusive</u> means by which a
> <u>natural parent may be involuntarily</u>
> <u>deprived of custody</u> of his children. In
> the absence of such showing, the natural
> parent is legally entitled to the custody
> of his minor children. Section 61-105,
> R.C.M. 1947. (Emphasis added.)

<u>Doney</u>, 570 P.2d at 577. The stringent standard set forth in
<u>Doney</u> has been substantially modified in some circumstances,
as pointed out in Brost v. Glasgow (Mont. 1982), 651 P.2d 32,
39 St.Rep. 1679. Section 40-4-221, MCA, was enacted after
the <u>Doney</u> case and it changes the test to be used to
determine custody in this situation. The <u>Brost</u> case involved
a custody fight between the natural father and the maternal
grandmother. The lower court granted custody to the
grandmother and we held,

> that in custody hearings resulting after
> the death of the custodial parent as
> provided for in section 40-4-221, MCA, it
> is not error for the District Court to
> apply the "best interest of the child"
> test in determining custody between the
> natural father and the maternal
> grandmother.

<u>Brost</u>, 651 P.2d at 34. The natural father in <u>Brost</u> cited the
<u>Doney</u> case in arguing "that if a non-parent wants to acquire
custody, he must proceed under far more stringent standards
for intervention." <u>Brost</u>, 651 P.2d at 34. We refused to
require those stricter standards.

Appellant intervened in this case under § 40-4-221,
MCA, which, as in <u>Brost</u>, provides for custody hearings after
the custodial parent dies. That statute provides:

> (1) Upon the death of a parent granted
> custody of a child, custody shall pass to
> the noncustodial parent unless one or
> more parties named in subsection (2)
> request a custody hearing. The
> noncustodial parent shall be a party in

any proceeding brought under this section.

(2) Upon the death of a parent granted custody of a child, any of the following parties may request a custody hearing and seek custody of the child:

(a) the noncustodial natural parent;

(b) the surviving spouse of the deceased custodial parent;

(c) a person nominated by the will of the deceased custodial parent;

(d) any person nominated by the child if the child is at least 12 years old;

(e) any other person if that person has actual physical control over the child;

(f) any other party whom, upon showing of good cause, the court permits to intervene as an interested party.

(3) The hearing and determination of custody shall be governed by this part. (Emphasis added.)

Appellant qualified as an intervenor under sub (e), as a person having actual physical control of the child. The last line of that statute is dispositive of this issue. "[T]his part," as mentioned in the statute, is Part 2 of Chapter 4 of Title 40, MCA, and it provides, at § 40-4-212, MCA, only one test for custody where the custodial parent dies and there is an intervenor under the statute. Section 40-4-212, MCA, provides:

The court shall determine custody in accordance with the best interest of the child. The court shall consider all relevant factors including:

(1) the wishes of the child's parent or parents as to his custody;

6

(2) the wishes of the child as to his custodian;

(3) the interaction and interrelationship of the child with his parent or parents, his siblings, and any other person who may significantly affect the child's best interest;

(4) the child's adjustment to his home, school, and community; and

(5) the mental and physical health of all individuals involved.

The transcript and court order show that the court did not solely consider the best interest of the child test. The court also cited the Doney decision and apparently felt that appellant, to gain custody, must show that the natural father was unfit. However, the court went on to apply the best interest of the child test and stated:

> The Court considering all factors such as the interaction and interrelationship of [C.G.] with his natural parent, his siblings, and others who have already significantly affected his life, finds as a matter of law, that it is in the best interests of [C.G.] to be with his natural father, there being no substantial proof that he would be unfit. Further, to delay [C.G.'s] transfer for an indefinite period of time to the custody of his natural father perhaps would not be in [C.G.'s] best interests.

Thus, while initially the court applied the wrong standard (from Doney), ultimately the court applied the best interest of the child test. Therefore, we hold that the court did not commit reversible error in determining custody of the child.

The second issue is whether the court properly awarded custody to the father under the best interest of the child test. The standard of review is clear.

7

> "The responsibility of deciding custody is a delicate one which is lodged with the district court. The judge hearing oral testimony in such a controversy has a superior advantage in determining the same, and his decision ought not to be disturbed except on a clear showing of abuse of discretion. [Citing cases.]"

In Re Marriage of Nalivka (Mont. 1986), 720 P.2d 683, 686, 43 St.Rep. 1079, 1083, quoting In Re Marriage of Obergfell (Mont. 1985), 708 P.2d 561, 563, 42 St.Rep. 1414, 1417. We do not find that the court abused its discretion in awarding custody to the natural father. The court made several findings establishing the apparent good character and good intentions of respondent. The court concluded that it would be in the child's best interest to be with his natural father. That conclusion is not impermissible. The Commissioners' Note to § 40-4-212, MCA (the best interest test) states, in part:

> The five factors mentioned specifically are those most commonly relied upon in the appellate opinions; but the language of the section makes it clear that the judge need not be limited to the factors specified. Although none of the familiar presumptions developed by the case law are mentioned here, the _language of the section is consistent with preserving such rules of thumb._ The preference for the mother as custodian of young children when all things are equal, for example, is _simply a shorthand method of expressing the best interest of children_--and this section enjoins judges to decide custody cases according to that general standard. _The same analysis is appropriate to the other common presumptions: a parent is usually preferred to a non-parent;_ the existing custodian is usually preferred to any new custodian because of the interest in assuring continuity for the child;

8

> preference is usually given to the custodian chosen by agreement of the parents. (Emphasis added.)

In sum, the court did not abuse its discretion in finding that, in this situation, the parent was generally preferred to the non-parent, given the evidence of the parent's good character.

Lastly, we note appellant's assertion that the court should have appointed counsel to represent the interests of C.G. Appellant does not assert, and we do not find in the record, that the court was requested to appoint counsel. Therefore, we find no error in the refusal to appoint counsel for C.G.

Affirmed.

_____
Justice

We concur:

_____
Chief Justice

_____

_____

_____

_____

_____
Justices

9